### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK
### SYRACUSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> ex rel. <br><br> **H REMIDEZ, LLC** <br><br> Plaintiff, <br><br> v. <br><br> **STRAUSS VENTURES, LLC d/b/a THE GRAND HEALTH CARE SYSTEM; BARNWELL OPERATIONS ASSOCIATES, LLC; CHITTENANGO CENTER LLC; CLEARVIEW OPERATING CO., LLC; GRAND BATAVIA, LLC; GRAND GREAT NECK, LLC; GRAND MOHAWK VALLEY, LLC; GRAND SOUTH POINT LLC; HERITAGE OPERATING ASSOCIATES LLC; RIVER VALLEY OPERATING ASSOCIATE LLC; ROME CENTER LLC; THE CENTER FOR REHABILITATION AND HEALTHCARE AT DUTCHESS, LLC** <br><br> Defendants. | **CASE NO.:**  6:26-cv-214 (GTS/ML) <br><br> **COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 et seq.,** <br><br> **FILED IN CAMERA AND UNDER SEAL** <br><br> **PURSUANT TO 31 U.S.C. § 3730** <br><br> **NOT FOR PUBLIC DISCLOSURE** <br><br> **DO NOT PLACE IN PRESS BOX** <br><br> **DO NOT ENTER ON PACER** <br><br> **JURY TRIAL DEMANDED** |

### QUI TAM COMPLAINT

1. Despite certifying compliance with federal law, Defendant Strauss Ventures, LLC d/b/a The Grand Health Care System ("The Grand") and its affiliated skilled nursing facilities obtained Paycheck Protection Program ("PPP") loans totaling $16,553,148 from the Small Business Administration ("SBA") while simultaneously engaged in a scheme to defraud Medicare, Medicaid, and TRICARE through the submission of false claims for medically unnecessary and unskilled rehabilitation therapy services.

1

2. A condition of receiving PPP funds was certifying, among other things, that the applicant was eligible to receive the loan under the rules in effect at the time of the application. PPP loan applications required borrowers to make good-faith certifications regarding their eligibility and compliance with applicable law.

3. During the same period that The Grand and its affiliated entities applied for and received PPP loans — from April 2020 through April 2021 — The Grand was actively engaged in illegal conduct that it later admitted to in a Settlement Agreement with the United States Department of Justice.

4. On or about the date of the Settlement Agreement in United States ex rel. Rosenberger and Retig v. Strauss Ventures LLC, et al., No. 1:19-cv-1311 (N.D.N.Y.), The Grand agreed to pay $21,300,000, including $9,941,860 in restitution, to resolve allegations that it submitted false claims to Medicare, Medicaid, and TRICARE for medically unnecessary and unskilled rehabilitation therapy services from January 1, 2016 through June 30, 2021.

5. In the Settlement Agreement, The Grand expressly admitted and accepted responsibility for conduct described therein, including billing federal healthcare programs for rehabilitation therapy services that were not medically necessary, not skilled, not properly supervised, and/or not accurately documented.

6. By applying for and receiving PPP loans while engaged in this illegal conduct, The Grand and its affiliated entities made false certifications of eligibility to the SBA. These false certifications caused the submission of false claims in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, et seq. ("False Claims Act" or "FCA") and fraudulently induced the issuance and forgiveness of taxpayer-backed loans totaling $16,827,495.77

plus fees, for a grand total of $17,192,845.77, that otherwise would have been denied as ineligible.

7. The Grand's PPP loan certifications were materially false because, at the time those certifications were made, The Grand was engaged in conduct that it subsequently admitted violated federal healthcare laws — conduct that rendered The Grand ineligible for the PPP loans it sought and received.

8. This action seeks to recover on behalf of the United States damages and civil penalties arising from the purposeful submission of false and/or fraudulent claims to the Government.

9. Relator brings this action on behalf of the United States pursuant to 31 U.S.C. § 3730(b).

## PARTIES

10. Relator H Remidez, LLC, is a Texas limited liability company. Dr. Herbert Remidez, Jr. is the company's president, secretary, and treasurer. Dr. Remidez holds a Ph.D. in Information Science and Learning Technologies from the University of Missouri at Columbia. He has worked as a faculty member in the Satish and Yasmin Gupta College of Business at the University of Dallas since 2010, where he currently serves as a tenured Associate Professor. From 2014 through the present, Dr. Remidez has taught business analytics courses with a focus on cloud computing, big data analytics, predictive modeling, advanced business analytics, and artificial intelligence in the University's Master of Science in Business Analytics degree program. He is the Program Director for the University's MS Business Analytics and MS Data Science and AI programs. Dr. Remidez used advanced, proprietary data analytics to identify the fraud specified here.

3

11. Defendant Strauss Ventures, LLC d/b/a The Grand Health Care System ("The Grand") is a limited liability company with its principal office address at 2 Care Drive, Suffern, New York 10901. The Grand operates a network of skilled nursing facilities in New York State. EIN: 47-1594822.

12. Defendant Barnwell Operations Associates, LLC, d/b/a The Grand Rehabilitation and Nursing at Barnwell, is a limited liability company with its principal office address at 3230 Church Street, Valatie, NY 12184.

13. Defendant Chittenango Center LLC, d/b/a The Grand Rehabilitation and Nursing at Chittenango, is a limited liability company with its principal office address at 331 Russell Street, Chittenango, NY 13037.

14. Defendant Clearview Operating Co., LLC, d/b/a The Grand Rehabilitation and Nursing at Queens, is a limited liability company with its principal office address at 157-15 19th Avenue, Whitestone, NY 11357.

15. Defendant Grand Batavia, LLC is a limited liability company with its principal office address at 257 State Street, Batavia, NY 14020.

16. Defendant Grand Great Neck, LLC, d/b/a The Grand Rehabilitation and Nursing at Great Neck, is a limited liability company with its principal office address at 15 Saint Paul's Place, Great Neck, NY 11021.

17. Defendant Grand Mohawk Valley, LLC, d/b/a The Grand Rehabilitation and Nursing at Mohawk, is a limited liability company with its principal office address at 99 6th Avenue, Ilion, NY 13357.

4

18. Defendant Grand South Point LLC, d/b/a The Grand Rehabilitation and Nursing at South Point, is a limited liability company with its principal office address at 1 Long Beach Road, Island Park, NY 11558.

19. Defendant Heritage Operating Associates LLC, d/b/a The Grand Rehabilitation and Nursing at Utica, is a limited liability company with its principal office address at 1657 Sunset Avenue, Utica, NY 13502.

20. Defendant River Valley Operating Associate LLC, d/b/a The Grand Rehabilitation and Nursing at River Valley, is a limited liability company with its principal office address at 140 Main Street, Poughkeepsie, NY.

21. Defendant Rome Center LLC, d/b/a The Grand Rehabilitation and Nursing at Rome, is a limited liability company with its principal office address at 801 North James Street, Rome, NY 13440. EIN: 47-2649849.

22. Defendant The Center for Rehabilitation and Healthcare at Dutchess, LLC, The Grand Rehabilitation and Nursing at Pawling, is a limited liability company with its principal office address at 9 Reservoir Road, Pawling, NY 12564. EIN: 47-2649850.

## **JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because this action is brought on behalf of the United States, and under 28 U.S.C. § 1331 as this action arises under federal law, specifically the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.

24. Venue is proper in this District under 31 U.S.C. § 3732(a) because Defendants Barnwell Operations Associates, LLC, d/b/a The Grand Rehabilitation and Nursing at Barnwell in Valatie, Columbia County; Chittenango Center LLC, d/b/a The Grand Rehabilitation and

5

Nursing at Chittenango in Chittenango, Madison County; Grand Mohawk Valley, LLC, d/b/a The Grand Rehabilitation and Nursing at Mohawk, in Ilion, Herkimer County; Heritage Operating Associates, LLC, d/b/a the Grand Rehabilitation and Nursing at Utica, in Utica, Oneida County; and Rome Center, LLC, d/b/a The Grand Rehabilitation and Nursing at Rome, in Rome, Oneida County all are located in the Northern District of New York and a substantial part of the events giving rise to the claims herein occurred in this judicial district. Alternatively, venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this judicial district.

25. The claims arise from conduct occurring in this district.

26. Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). The Relator made voluntary disclosures to the United States before filing this lawsuit.

## REGULATORY FRAMEWORK

### *The FCA*

27. The FCA prohibits any person or entity from knowingly presenting or causing to be presented a false or fraudulent claim for payment or approval, or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A) and (B).

28. The FCA imposes liability on any person who commits any of the prohibited acts, with liability including treble damages and civil penalties ranging from $5,000 to $10,000 per false claim. 31 U.S.C. § 3729(a).

29. The FCA defines the term 'knowing' to include actual knowledge, deliberate ignorance of the truth or falsity of the information, or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). Knowledge or scienter is not required.

### *The CARES Act*

30. On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281. The CARES Act appropriated funds to provide forgivable loans through a new program called the Paycheck Protection Program.

31. Congress designed the PPP to provide funds to small businesses to maintain their payroll and other operational expenses during the COVID-19 pandemic.

32. Under the CARES Act and implementing regulations, to be eligible for PPP loans, an applicant must certify that it meets statutory eligibility requirements, including that the applicant is a small business concern as defined by the Small Business Act.

33. Importantly, the statute and regulations made ineligible any applicant that was engaged in conduct in violation of federal healthcare laws. An applicant certified that it was not subject to debarment, suspension, or other ineligibility as a result of federal healthcare laws, regulations, or court orders.

### *The SBA Required Certifications*

34. The SBA PPP loan application and related documents required borrowers to make the following certification:

> I certify under penalty of perjury that I have reviewed the information in this application and that it is true, accurate, and complete to the best of my knowledge.

7

I understand that any false statements contained in this application or supporting documents are subject to criminal prosecution under 18 U.S.C. §§ 1001 and 1010, and subject to civil penalties under 31 U.S.C. § 3729 (False Claims Act).

35. Additionally, in certifying eligibility, applicants had to affirmatively confirm that they were not subject to federal debarment or suspension, as follows:

I certify that I am not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded by any Federal department or agency.

36. The SBA also required borrowers to certify that they would use loan funds only for permissible purposes and in compliance with all applicable laws.

37. Upon the recommendation of lenders, the SBA permitted forgiveness of PPP loan principal and accrued interest if the borrower certified that it met specified eligibility criteria, used loan proceeds for authorized purposes, and otherwise complied with PPP requirements. Interim Final Rule Regarding Eligibility, Loan Size and Award Procedures for the Paycheck Protection Program, 85 Fed. Reg. 23,638 (Apr. 28, 2020) (as amended).

38. The Federal Register notice stated in relevant part that:

To obtain loan forgiveness, a borrower must certify, among other things, that: (1) the funds have been used consistent with the authorized uses of the loan; (2) the borrower is eligible for the loan; and (3) the borrower complies with the affiliation and other eligibility rules of the SBA.

39. The SBA rules and regulations expressly prohibited the forgiveness of loans obtained through false statements or certifications, as follows:

A borrower that is not eligible for a PPP loan, or that obtained the PPP loan based on false statements or certifications, is not eligible for loan forgiveness.

8

## RELATOR'S METHODOLOGY

40. In 2020, Dr. Remidez, the principal of the Relator, used his knowledge of advanced analytics in conjunction with various cloud computing software packages that rely on artificial intelligence ("AI") to review electronic information maintained by the SBA detailing PPP loans made to individuals, sole proprietorships, and companies across the country.

41. Dr. Remidez assembled a PPP-loan database of 67 separate and related tables ranging in size from 2,840 to 8.8 million rows. Database tables organize information into rows and columns, much like an Excel spreadsheet, making it easier to store and compare.

42. His analysis began by converting each of the PPP program regulations and guidance into software rules that could be used to help examine the hundreds of billions of dollars in taxpayer-backed loans.

43. After structuring and organizing the SBA data, Dr. Remidez augmented his PPP-loan database with information from 27 separate sources, including:

- non-profit tax information maintained by the Internal Revenue Service;
- data from the U.S. Treasury, the Department of Labor, the Federal Deposit Insurance Corporation;
- legislative lobbying records held by Congress;
- datasets detailing individuals and companies debarred or excluded from federal contracting, businesses registered under the Foreign Agents Registration Act, investment firms supervised by the Securities and Exchange Commission ("SEC"), and firms that are traded on national stock exchanges; and,
- Centers for Medicare & Medicaid Services data related to facility ownership.

44. These datasets use different naming conventions and identifiers, making an electronic comparison impossible. Resolving these differences to allow an accurate comparison required exploratory analysis, data preparation, and the development of customized computer code, commonly called recipes, to identify and resolve inconsistencies and anomalies. In this case, the data "cleaning" process used customized software recipes with as many as 59 steps.

45. These cleaning steps include, for example, removing leading and trailing whitespaces, replacing missing values, and converting names to uppercase. This cleaning process was applied to each of these varied datasets. Many of the database inquiries used to standardize the information required hours to complete.

46. Dr. Remidez then employed an entity resolution software program powered by Artificial Intelligence ("AI"). AI can be categorized as generative or discriminative. The AI-assisted entity resolution software systems used in this analysis are discriminative AI systems.

47. Generative systems, like ChatGPT or Stable Diffusion, generate new text output or images based on training from massive datasets. Discriminative AI systems are used for classification or regression and return a prediction based on conditional probability. One example of these systems is the time travel predictions made by Google Maps. The AI-assisted entity resolution software systems used as part of this analysis are discriminative AI systems.

48. Entity resolution software determines whether records from diverse sources match. Record-matching programs can match names with slight misspellings, accent marks, and abbreviations. They cannot recognize relationships within the data or update results to

incorporate newly added information. AI-driven programs perform rudimentary matching while incorporating additional techniques to recognize what the underlying data strings represent.

49. The AI software used by Dr. Remidez recognizes common nicknames, common misspellings, and variations on the same address. For example, the AI learning model equates Jim with James, Bill with William, and Mohammed with Mohammad. It also recognizes and matches address variations, such as 1 First St. and One 1st Street. When new information is added, the AI-driven software dynamically updates. In simple terms, it "learns" with every update.

50. In the spring and fall of 2021, Dr. Remidez used advanced analytics techniques, including AI, to review electronic information maintained by the SBA detailing PPP loans to borrowers in one state in November 2021 shows the differences between conventional and AI-driven software analysis. An analysis using Microsoft Excel found 209 duplicate borrowers among 128,807 loans. After cleaning the data, Excel identified 253. Using the same data, the AI-driven software labeled 865 as duplicates, four as possible duplicates, and 24,000 as possibly related.

51. In this example, after adding eight additional data sets — comprising medical practices and business addresses, Economic Injury Disaster Loans, resident visa applications, Shuttered Venue, and Restaurant Revitalization loans — the duplicates increased by 63, and the possibly related category fell by 2,600.

52. While these results are impressive, all AI systems are fallible. To mitigate errors, Dr. Remidez compared the results against additional records, such as state business registries,

11

and employed other filters and software to verify the outcome. Finally, Dr. Remidez manually checked the results.

53. Dr. Remidez augmented his databases with information from the SEC, USAspending.gov, which maintains spending records on other pandemic aid programs, and various publicly available datasets detailing corporate ownership.

54. The matching process allowed Dr. Remidez to identify loan recipients and affiliates that were engaged in illegal conduct while certifying compliance with federal law.

55. Dr. Remidez cross-referenced PPP loan recipients with federal enforcement actions, settlement agreements, and corporate integrity agreements to identify borrowers who certified compliance with federal law while simultaneously engaged in conduct that they later admitted was unlawful.

56. After a rigorous electronic and manual review of the results to ensure accuracy, Dr. Remidez applied the software rules he developed from PPP loan program regulations to identify violations of the eligibility criteria.

57. Although Relator used publicly available information, the Relator is the original source of the allegations and the proprietary analysis, methodology, and data synthesis detailed herein.

## FACTUAL ALLEGATIONS

58. During the period from January 1, 2016 through June 30, 2021, The Grand and its affiliated skilled nursing facilities engaged in a scheme to submit false claims to Medicare, Medicaid, and TRICARE for rehabilitation therapy services. The Government alleged, and The Grand admitted and accepted responsibility for, the following conduct:

(a) billing federal healthcare programs for rehabilitation therapy services that were not medically necessary;

(b) billing federal healthcare programs for rehabilitation therapy services that were not skilled services;

(c) billing federal healthcare programs for rehabilitation therapy services that were not properly supervised by a licensed therapist or other qualified professional;

(d) billing federal healthcare programs for rehabilitation therapy services that were not accurately documented in the patient's medical record;

(e) providing rehabilitation therapy services that did not meet the requirements of the applicable Medicare regulations or CMS guidance;

(f) failing to maintain adequate documentation to support the medical necessity, skilled nature, and proper supervision of rehabilitation therapy services;

(g) failing to maintain adequate quality assurance and compliance procedures to prevent submission of false claims;

(h) failing to properly train staff on compliance with federal healthcare laws and billing requirements; and

(i) generally engaging in fraudulent billing practices designed to maximize federal healthcare reimbursements.

59. On or about the date of the Settlement Agreement in United States ex rel. Rosenberger and Retig v. Strauss Ventures LLC, et al., No. 1:19-cv-1311 (N.D.N.Y.), The Grand agreed to pay $21,300,000 to resolve the Government's claims. Of this amount, $9,941,860 was designated as restitution. The Covered Conduct in the Settlement

Agreement spans the period from January 1, 2016 through June 30, 2021 — overlapping entirely with the period during which The Grand applied for and received PPP loans.

60. In connection with the settlement, The Grand entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States Department of Health and Human Services ("OIG-HHS"). The CIA required, among other things, the appointment of a Compliance Officer and Compliance Committee, the development of written standards and policies, training programs, claims review procedures, a disclosure program, and reporting obligations — all reflecting the severity and scope of The Grand's prior violations.

61. The original qui tam complaint in United States ex rel. Rosenberger and Retig v. Strauss Ventures LLC was filed on October 24, 2019 by relators Stacey Rosenberger and Kelley Retig. The Government investigated the allegations and determined that The Grand had engaged in the illegal conduct described above.

62. The Grand's illegal conduct was not merely historical — it was ongoing and contemporaneous with the PPP loan applications. Specifically, The Grand's Covered Conduct extended through June 30, 2021, while its PPP loan applications were submitted between April 2020 and April 2021.

63. By applying for PPP loans while engaged in admitted illegal conduct, The Grand made false certifications of eligibility that were material to the SBA's decision to approve the loans.

## THE GRAND'S PPP LOANS

64. From April 2020 through April 2021, eleven entities affiliated with The Grand applied for and received PPP loans with a total principal value of $16,553,148. Upon the

14

recommendation of the respective lenders, the SBA ultimately forgave $16,827,495.77 in principal and interest on these loans.

65. The PPP loans received by The Grand's affiliated entities are summarized below:

| Entity Name | SBA Loan # | Lender | Date of Loan | Amount of Loan | Date Forgiven | Amount Forgiven |
|---|---|---|---|---|---|---|
| Barnwell Operations Associates, LLC | 2923347206 | Popular Bank | 4/16/2020 | $1,745,480.00 | 7/2/2021 | $1,766,619.70 |
| Chittenango Center LLC | 3923818903 | Cross River Bank | 4/28/2021 | $708,842.00 | 4/6/2023 | $722,436.23 |
| Clearview Operating Co., LLC | 2828017203 | Popular Bank | 4/16/2020 | $2,128,230.00 | 7/18/2022 | $2,176,292.53 |
| Grand Batavia, LLC | 4714127202 | Peapack-Gladstone Bank | 4/27/2020 | $617,600.00 | 6/11/2021 | $624,469.74 |
| Grand Great Neck, LLC | 9410907204 | Webster Bank National Association | 4/28/2020 | $2,175,800.00 | 6/30/2021 | $2,200,657.77 |
| Grand Mohawk Valley, LLC | 4620357200 | Peapack-Gladstone Bank | 4/27/2020 | $906,100.00 | 6/11/2021 | $916,178.81 |
| Grand South Point LLC | 7226818808 | Northeast Bank | 4/21/2021 | $2,258,192.00 | 4/6/2023 | $2,301,932.87 |
| Heritage Operating Associates LLC | 1117967107 | Peapack-Gladstone Bank | 4/9/2020 | $1,536,100.00 | 5/20/2021 | $1,551,629.34 |
| River Valley Operating Associate LLC | 8090998701 | Northeast Bank | 4/7/2021 | $1,893,050.00 | 4/6/2023 | $1,930,081.17 |
| Rome Center LLC | 9095698807 | Cross River Bank | 4/23/2021 | $1,513,844.00 | 4/6/2023 | $1,543,125.48 |
| The Center for Rehabilitation | 2847357206 | Popular Bank | 4/16/2020 | $1,069,910.00 | 7/18/2022 | $1,094,072.13 |

| | | | | | |
|---|---|---|---|---|---|
| and Healthcare at Dutchess, LLC | | | | | |
| **Total** | | | | $16,553,148.00 | | $16,827,495.77 |

66. Barnwell Operations Associates, LLC applied for and received a PPP loan in the original principal amount of $1,745,480.00 from Popular Bank on April 16, 2020 with SBA Loan Number 2923347206. The SBA forgave $1,766,619.70 on July 2, 2021.

67. Chittenango Center LLC applied for and received a PPP loan in the original principal amount of $708,842.00 from Cross River Bank on April 28, 2021 with SBA Loan Number 3923818903. The SBA forgave $722,436.23 on April 6, 2023.

68. Clearview Operating Co., LLC applied for and received a PPP loan in the original principal amount of $2,128,230.00 from Popular Bank on April 16, 2020 with SBA Loan Number 2828017203. The SBA forgave $2,176,292.53 on July 18, 2022.

69. Grand Batavia, LLC applied for and received a PPP loan in the original principal amount of $617,600.00 from Peapack-Gladstone Bank on April 27, 2020 with SBA Loan Number 4714127202. The SBA forgave $624,469.74 on June 11, 2021.

70. Grand Great Neck, LLC applied for and received a PPP loan in the original principal amount of $2,175,800.00 from Webster Bank National Association on April 28, 2020 with SBA Loan Number 9410907204. The SBA forgave $2,200,657.77 on June 30, 2021.

71. Grand Mohawk Valley, LLC applied for and received a PPP loan in the original principal amount of $906,100.00 from Peapack-Gladstone Bank on April 27, 2020 with SBA Loan Number 4620357200. The SBA forgave $916,178.81 on June 11, 2021.

16

72. Grand South Point LLC applied for and received a PPP loan in the original principal amount of $2,258,192.00 from Northeast Bank on April 21, 2021 with SBA Loan Number 7226818808. The SBA forgave $2,301,932.87 on April 6, 2023.

73. Heritage Operating Associates LLC applied for and received a PPP loan in the original principal amount of $1,536,100.00 from Peapack-Gladstone Bank on April 9, 2020 with SBA Loan Number 1117967107. The SBA forgave $1,551,629.34 on May 20, 2021.

74. River Valley Operating Associate LLC applied for and received a PPP loan in the original principal amount of $1,893,050.00 from Northeast Bank on April 7, 2021 with SBA Loan Number 8090998701. The SBA forgave $1,930,081.17 on April 6, 2023.

75. Rome Center LLC applied for and received a PPP loan in the original principal amount of $1,513,844.00 from Cross River Bank on April 23, 2021 with SBA Loan Number 9095698807. The SBA forgave $1,543,125.48 on April 6, 2023.

76. The Center for Rehabilitation and Healthcare at Dutchess, LLC applied for and received a PPP loan in the original principal amount of $1,069,910.00 from Popular Bank on April 16, 2020 with SBA Loan Number 2847357206. The SBA forgave $1,094,072.13 on July 18, 2022.

77. Each of The Grand's affiliated entities certified on their PPP loan applications that the applicant was eligible to receive a loan under the rules in effect at the time of the application.

78. At the time these certifications were made, The Grand and its affiliated entities were engaged in a scheme to defraud Medicare, Medicaid, and TRICARE through the submission of false claims for medically unnecessary and unskilled rehabilitation therapy

17

services — conduct that The Grand subsequently admitted and accepted responsibility for in the Settlement Agreement.

79. The Grand's certifications of eligibility were false because an applicant engaged in illegal conduct — including the submission of false claims to federal healthcare programs — was not eligible to receive PPP funds. The Grand's false certifications of compliance with applicable law were material to the SBA's decision to approve the loans.

80. Had the SBA known that The Grand and its affiliated entities were engaged in a scheme to defraud federal healthcare programs, the SBA would not have authorized the PPP loans, and lenders would not have issued them.

81. The Grand's illegal conduct was not merely historical — it was ongoing and contemporaneous with the PPP loan applications. The Covered Conduct in the Settlement Agreement spans January 1, 2016 through June 30, 2021, while The Grand's PPP loan applications were submitted between April 2020 and April 2021.

82. After receiving taxpayer-backed PPP loans for which they were not eligible, The Grand's affiliated entities submitted loan forgiveness applications falsely certifying that they complied with PPP eligibility requirements. Both the PPP loan forgiveness applications and applicable federal regulations explicitly state that borrowers who were not eligible for PPP loans or who received funds based on false certifications do not qualify for loan forgiveness.

83. Despite these prohibitions, The Grand's affiliated entities knowingly sought and obtained forgiveness of principal and interest totaling $16,827,495.77 on PPP loans that were fraudulently induced and unlawfully obtained.

18

## COUNT 1
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. §§ 3729, et seq.

84. Relator re-alleges and incorporates by reference every allegation contained in paragraphs 1-83 as though fully set forth herein.

85. As described in greater detail above, the Defendants exploited federal financial aid programs designed to support financially struggling small businesses during the COVID-19 pandemic. Specifically, the Defendants knowingly made, used, or caused to be made and used false and fraudulent statements and certifications to obtain PPP loans and the forgiveness of those loans, despite being ineligible under applicable statutory and regulatory requirements.

86. Defendants knowingly submitted PPP loan applications that falsely certified compliance with PPP eligibility requirements, including certifying that they were eligible to receive loans while engaged in conduct that violated federal healthcare laws.

87. The Grand directed, controlled, and/or caused the submission of the ineligible loan and forgiveness applications described above through its centralized corporate offices at 1720 White Stone Expressway, Suite 500, Whitestone, New York 11357, and through shared management and common control of its affiliated skilled nursing facilities.

88. These false certifications were material to the SBA's decision to approve Defendants' PPP loan applications. Federal law and SBA regulations expressly permitted lenders and the SBA to rely on application certifications to determine eligibility for PPP loans and the amount of financial assistance authorized.

89. Had the SBA known that Defendants were engaged in a scheme to defraud Medicare, Medicaid, and TRICARE through the submission of false claims for medically

19

unnecessary and unskilled rehabilitation therapy services, the SBA would not have authorized the loans, and lenders would not have issued them.

90. By fraudulently inducing the SBA and participating lenders to approve PPP loans through materially false certifications, Defendants rendered all resulting loan disbursements false or fraudulent claims within the meaning of the FCA.

91. After receiving taxpayer-backed PPP loans for which they were not eligible, Defendants electronically submitted loan forgiveness applications falsely certifying that they complied with PPP eligibility requirements.

92. Both the PPP loan forgiveness applications and applicable federal regulations explicitly state that borrowers who were not eligible for PPP loans or who received funds based on false certifications do not qualify for loan forgiveness.

93. Despite these prohibitions, Defendants knowingly sought and obtained forgiveness of principal and interest on PPP loans that were fraudulently induced and unlawfully obtained.

94. As a direct and proximate result of Defendants' false claims and false statements, the United States paid and caused to be paid taxpayer funds, including $17,192,845.77 in principal and interest forgiven on Defendants' ineligible PPP loans, and statutory lender processing fees paid by the SBA to participating lenders in connection with originating and disbursing those loans.

95. By engaging in the conduct described above, Defendants violated the False Claims Act by:

> (a) 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

20

(b) 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

96. As a result of Defendants' violations of the FCA, the United States has suffered and continues to suffer damages, including, but not limited to, forgiven loan principal and interest and lender fees paid in connection with ineligible PPP loans, and is entitled to treble damages, civil penalties for each false claim, costs, and all other relief available under the FCA.

## **PRAYER**

97. WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

(a) This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

(b) This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

(c) This Court enter an order requiring Defendants to pay all expenses, attorneys' fees, and costs associated with this action;

(d) This Court enter an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

(e) This Court grants any and all other relief as this Court determines to be reasonable and just.

21

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Dated: February 10, 2026

Respectfully submitted,

/s/ David Scher
David Scher
Hoyer Law Group, PLLC
10 K St. SE, Suite 423
Washington, D.C. 20003
dave@hoyerlawgroup.com
202-997-8227
Attorneys for Relator

22